**UNITED STATES of America**
v.
**BOSSIER PARISH SCHOOL BOARD**
**et al.**
**Civ. A. No. 9282.**

United States District Court
W. D. Louisiana,
Shreveport Division.
Aug. 20, 1963.

Burke Marshall, Asst. Atty. Gen., St. John Barrett, Atty., Washington, D. C., David H. Marlin, Atty., Civil Rights Division, Dept. of Justice, Washington, D. C., Edward L. Shaheen, U. S. Atty., W. D. Louisiana, Shreveport, La., for the government.

Jack P. F. Gremillion, Atty. Gen. of Louisiana, Baton Rouge, La., William P. Schuler, Asst. Atty. Gen., New Orleans, La., W. Scott Wilkinson, Special Asst. to the Atty. Gen. of Louisiana, Shreveport, La., Louis H. Padgett, Dist. Atty. for the 26th Judicial District of Louisiana, Bossier City, La., for defendants.

BEN C. DAWKINS, Jr., Chief Judge.

The United States brings this action seeking an injunction preventing the defendants from segregating dependents of military personnel or civilian employees of the federal government in the public schools of Bossier Parish upon the basis of their race or color. Defendants (the School Board, its members, and Superintendent) have moved to dismiss on the grounds that the Court lacks jurisdiction and that plaintiff has failed to allege a claim upon which relief may be granted.

If the United States is a proper party plaintiff, that is, if it has standing to sue, then this Court has jurisdiction under 28 U.S.C. § 1345.[1] In support of its standing and its claim for relief, plaintiff asserts the following points:

(1) The United States may sue upon the contractual obligation assumed by defendants when they received grants for local school construction under the provisions of Chapter 19 of Title 20, U.S.C.

(2) The United States may sue under an implied statutory authority to enforce the provisions of Chapter 19 of Title 20, U.S. C.

(3) The United States may sue to enforce its interest stated in 20 U.S.C. § 636(b) (1) (F), its interest in preserving an efficient military establishment, and its financial interest in ensuring that its money is legally expended; all of which are infringed by defendants' violation of the Fourteenth Amendment.

Three actions almost identical with this one have been decided by other Federal District Courts. Judge Mize for the Southern District of Mississippi, Southern Division, and Judge Grooms for the Northern District of Alabama, Northeast Division, both held that the plaintiff had no cause of action and no standing to bring the suit.[2] However, Judge Butzner for the Eastern District of Virginia, Richmond Division, held that the United States did have standing to sue and was entitled to relief.[3]

Judge Butzner based his decision upon the contractual obligation which he found to arise from the assurance given by the local school agency. When application was made for grants to help construct local school facilities, defendants were also required to give the assurance required by 20 U.S.C. § 636(b) (1) (F):

1. 28 U.S.C. § 1345: "Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."

2. United States of America v. Gulfport Municipal Separate School District, et al., U.S.D.C., S.D.Miss., 219 F.Supp. 691 (1963); United States of America v. Madison County Board of Education, et al., U.S.D.C., N.D.Ala., 219 F.Supp. 60 (May 1963).

3. United States of America v. County School Board of Prince George County, et al., U.S.D.C., E.D.Va., 221 F.Supp. 93 (1963).

" * * * the school facilities of such agency will be available to the children for whose education contributions are provided in this chapter on the same terms, *in accordance with the laws of the State in which the school district of such agency is situated*, as they are available to other children in such school district * * *." (Emphasis added.)

Plaintiff concedes that when the statute was passed this meant "federal children" [4] would be provided racially segregated schools in those states whose laws so provided. However, it contends that as State law changes, so does the meaning of the assurance. Since segregated education is no longer constitutional, it argues that State law must be construed as prohibiting racial segregation. From this, the argument runs, it follows that an assurance that school facilities will be made available to government children in accordance with State law means that they will be assigned to schools without regard to race or color.

Plaintiff asserts that "the sole legal issue in connection with the written assurance is whether the Louisiana law contemplates race as a factor in assignments." [5] The Court cannot agree that this is the issue. Assuming, for the moment, that the law is as plaintiff contends, there still must be some basis for its bringing this action. That basis, it is asserted, is contractual. If this is so, then the issue is whether defendants by their assurances *contracted* to assign federal children to schools without regard to race.

No one seriously contends that defendants intentionally contracted to provide schools for federal children without regard to race. Nevertheless, plaintiff insists that the assurance must be so construed by the Court. Judge Butzner found the statute and the assurance to be "clear and unambiguous" and held for the plaintiff. Judge Mize also found "that the language of the statutory Assurances is unambiguous," but he held for the defendants. Three Federal Courts have interpreted the assurance provision with varying results and many attorneys have argued each side of the issue. Under these circumstances, this Court cannot say that the statutory assurance is so unambiguous that it needs no interpretation. [6]

To interpret an ambiguous contract the Court must resort to well accepted rules of construction and must consider all of the pertinent facts and circumstances which may cast light upon the true meaning of the contract. Since the assurance provisions are required by statute, that statute must be construed. First, we observe the purpose of the act containing the required assurances. [7] Title 20 U.S.C. § 631 provides:

"The purpose of this chapter is to provide assistance for the construction of urgently needed minimum school facilities in school districts which have had substantial increases in school membership as a result of new or increased Federal activities. * * *"

The statute provides funds to cover part of the cost of educating federal children, and to ensure that the funds are utilized for this purpose, certain assurances are required from local school agencies. A very important assurance is that contained in 20 U.S.C. § 636(b) (1) (F) that *"the school facilities of such agency will be available to the children for whose education contributions are*

---

4. The term "federal children" is used throughout this opinion to mean school age dependents of plaintiff's military and civilian personnel stationed or employed at Barksdale Air Force Base and Bossier Base in Bossier Parish, Louisiana.

5. Reply memorandum for the United States in opposition to defendants' motion to dismiss, page 16.

6. A contract is ambiguous when it is reasonably or fairly susceptible of different constructions or meanings. 17A C.J.S. Contracts § 294(2).

7. "The fundamental rule of statutory construction is to ascertain and, if possible, give effect to the intention or purpose of the legislature as expressed in the statute." 82 C.J.S. Statutes, § 321.

*provided* * * *." (Emphasis added.) The emphasized language indicates the main thrust of the assurance. Conflict arises, however, over proper interpretation of the remainder of the assurance: " * * * in accordance with the laws of the State in which the school district of such agency is situated, as they are available to other children in such school district * * *."

All parties admit that when Congress enacted this statute it intended to provide contribution of funds for construction of schools even though segregated on the basis of race. It also is clear that even after the Supreme Court's decision of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the act has been administered so that segregated schools freely could obtain construction funds. During all of this time substantially the same assurances were made. The Congressional Record indicates that, although bills were introduced in the 82nd, 83rd, 84th, 85th, 86th, and 87th Congress seeking to withhold funds from school agencies which segregated upon the basis of race, none of them passed.[8]

In the 87th Congress, second session, 1962, there also was introduced H.R. 10056, a bill to amend Public Laws 815 and 874 in order " * * * to deny payments to school districts which are not in compliance with constitutional requirements that public schools be operated on a racially nondiscriminatory basis." Honorable Burke Marshall, Assistant Attorney General, then and now, heading the Civil Rights Division of the Department of Justice, and testifying favorably to enactment of the bill, found it necessary to say (Hearings, pp. 601–602):

" * * * * *The apparent congressional purpose was to provide Federal funds for the education of the children of our military forces and related civilians even though the educational facilities used were racially segregated. In the light of the Supreme Court's school decisions it would be desirable for Congress to clarify its purpose. H.R. 10056 is best suited for that end." (Emphasis added.)

The bill did not pass.

In the present 88th Congress, now in session, the Administration has introduced the omnibus Civil Rights Bill of 1963 (S. 1731). Title VI of that bill reads as follows:

"Sec. 601. Notwithstanding any provision to the contrary in any law of the United States providing or authorizing direct or indirect financial assistance for or in connection with any program or activity by way of grant, contract, loan, insurance, guaranty, or otherwise, no such law shall be interpreted as requiring that such financial assistance shall be furnished in circumstances under which individuals participating in or benefitting from the program or activity are discriminated against on the ground of race, color, religion,

8. 82d Congress, First Session: H.R. 2226, to withhold Federal aid from schools which discriminate between students by reason of their race, color, etc. (Congressional Record, Page 841).

83d Congress, First Session: H.R. 1008, to withhold Federal aid from schools which discriminate by reason of race, color, etc. (Congressional Record, Page 139).

84th Congress, First Session: H.R. 3305, to withhold Federal aid from schools which discriminate between students by reason of their race, color, etc. (Congressional Record, Page 1005).

85th Congress, First Session: H.R. 161, to withhold Federal aid from schools which discriminate between students by reason of their race, color, etc. (Congressional Record, Page 65).

86th Congress, First Session: H.R. 756, to withhold Federal aid from schools which discriminate between students by reason of their race, color, etc. (Congressional Record, Page 44).

87th Congress, First Session: H.R.'s 9268, 9269, 9327, 9344, and 9345, to prohibit discrimination in education, housing, public accommodations and employment or against public officials, because of race, color, religion, ancestry, or national origin. (Congressional Record, Pages, 19827, 20521 and 20580).

or national origin or are denied participation or benefits therein on the ground of race, color, religion, or national origin. All contracts made in connection with any such program or activity shall contain such conditions as the President may prescribe for the purpose of assuring that there shall be no discrimination in employment by any contractor or subcontractor on the ground of race, color, religion, or national origin."

It likewise is common knowledge that in passing the 1957 and 1960 Civil Rights Acts Congress expressly refused to empower the Attorney General to bring suits in the name of the United States to vindicate Fourteenth Amendment Rights of persons, other than in the field of voting, wherein the Fifteenth Amendment expressly authorized Congress to legislate. Clearly, notwithstanding its protests to the contrary, the Government here is attempting to accomplish indirectly that which it cannot do directly, namely, to eliminate alleged discrimination against federal children on account of their race.

To counter this strong evidence that Congress all along has intended to provide funds to schools being operated on a segregated basis, plaintiff invokes the principle that Congress should not be presumed to have enacted an unconstitutional statute, and concludes that to interpret the statutory assurance given by defendants as allowing schools to be operated on a racially segregated basis

would be to import an unconstitutional meaning to the statute.

This conclusion is based upon a misconstruction of the act and of the numerous judicial decisions dealing with racially segregated school systems. The law, so the Supreme Court has said, requires immediate acceptance of the principle that education should be furnished to all children under a system which does not discriminate upon the basis of race or color, but it does not require immediate implementation of such a principle. Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). It is firmly established that a reasonable transitional period is necessary.[9] Certainly Congress legally can continue to pay the federal government's share of the cost of educating federal children in those areas where the transition required by Brown is not yet complete. This is a function peculiarly within the discretion of Congress.

Judge Butzner decided that Virginia law prohibited the consideration of race in the assignment of students to schools, and therefore the operation of segregated schools violated the assurance. Assuming that Louisiana law adopts the policy of prohibiting considerations of race in assigning children to schools, it certainly does not require that this policy be effectuated immediately. No one can contend seriously that Louisiana law in this regard goes beyond the requirements of the second Brown decision in which the Supreme Court recognized the necessity

9. Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955); Board of Education of St. Mary's County v. Groves, 261 F.2d 527, (C.A.4, 1958); Orleans Parish School Board v. Bush, 242 F.2d 156, (C.A.5, 1957).

The United States Supreme Court stated in Cooper v. Aaron, 358 U.S. 1, at page 7, 78 S.Ct. 1401, at page 1404, 3 L. Ed.2d 5 "* * * a District Court, after analysis of the relevant factors (which, of course, excludes hostility to racial desegregation), might conclude that justification existed for not requiring the present nonsegregated admission of all qualified Negro children." The United States District Court in Kelly v. Board

of Education of City of Nashville, 159 F. Supp. 272 (M.D.Tenn.1958) noted: "By the same order jurisdiction of the action was retained 'during the period of transition'. The effect of the order was therefore *not to direct the immediate discontinuance of the practice of compulsory segregation in the public schools, but on the contrary, to permit its continuance during a gradual period of transition in keeping with what the Court believed was the true meaning of the second Brown opinion of the Supreme Court.* Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083." (Emphasis added.)

for a transitional period. It seems perfectly clear to this Court that Congress has demonstrated its desire to make grants for needed school facilities even though local schools have not passed through the transitional period and eliminated race as a factor in school assignments.

As this Court interprets the statutory assurance, especially in light of the legislative history recited above [10] and 20 U.S.C. § 642 prohibiting any department of the United States from exercising control over the personnel of any local or State educational agency,[11] the plaintiff on its contractual claim has no standing and no claim upon which relief can be granted. The statute and the assurances simply were not designed to fulfill the purpose for which plaintiff attempts to use them, nor do they lend themselves to that purpose.

■ The above analysis also disposes of plaintiff's contention that it has implied authority to sue to enforce the statute. Congress has appropriated funds for use by school agencies with full knowledge that they have not yet implemented a racially non-discriminatory school system. The purpose of the statute is to provide for construction of badly needed school facilities, and this is being accomplished. No failure to comply with the statute has been alleged which would warrant the exercise of any implied authority which might exist.

The United States in its complaint alleges defendants have violated the Fourteenth Amendment to the Constitution, and in its brief, as noted, contends it is not seeking to enforce the rights of others, but to protect its interests. Two of these interests necessarily have been disposed of in the foregoing discussion, namely, the asserted interest stated in 20 U.S.C. § 636(b) (1) (F), and its financial interest in ensuring that its money is "legally" expended. According to this Court's interpretation of the statute, no violation of these interests has been or could be alleged.

■ The remaining interest it asserts is that of preserving an efficient military establishment. Although plaintiff normally would be entitled to a trial upon this issue, its counsel admitted on oral argument that it had no proof of impairment of military efficiency. Counsel also conceded that not a single child, federal or non-federal, has applied for admission to a school on a non-segregated basis in Bossier Parish.

Finally, it must be noted that we sit in judgment here as a court of equity, of whom evenhandedness is a *sine qua non*. Surely it would be highly inequitable to grant an injunction which would favor only federal children, and not the much larger number of others who attend the public schools of Bossier Parish.

The motions to dismiss are granted.

---

10. "In order to determine the legislative intent in case of ambiguity, resort may be had to the history of the statute, and, more specifically, resort may be had to its legislative history or the history of the proceedings attending its actual passage through the legislature * * *." 82 C.J.S. Statutes § 355.

11. Reply memorandum for the United States in opposition to defendants' motion to dismiss, page 4: "The legislative history of section 242(a), enacted contemporaneously with section 642(a) makes it clear that these two provisions were included to prohibit federal intervention where the federal government has no legitimate interest declared elsewhere in the statute, and not otherwise." Plaintiff is correct in asserting that the federal government has an interest in providing education to federal children, but the legislative history indicates that it is mistaken when it construes the statute as giving it a right to require that this education be furnished on a racially non-discriminatory basis. Funds are provided to build school facilities even in areas where the transition to racially non-discriminatory school districts has not yet occurred.